UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JANUSZ KRZYSZTOF KOSEWSKI,

       Petitioner,              **MEMORANDUM AND ORDER**
                                 15-CV-928 (KAM)(VVP)

       - against –

KATARZYNA ANNA MICHALOWSKA,

       Respondent.
----------------------------------X
**MATSUMOTO, United States District Judge:**

        On February 20, 2015, petitioner Janusz Krzysztof

Kosewski ("petitioner") filed a petition under the Hague

Convention on the Civil Aspects of International Child Abduction

(the "Hague Convention" or the "Convention") as implemented in

the United States by the International Child Abduction Remedies

Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, seeking an order

directing respondent Katarzyna Anna Michalowska ("respondent")

to return their minor daughter, M.K. (the "child"),[1] now age 7,

to Poland.  Petitioner contends that respondent wrongfully

removed M.K. from Poland and wrongfully retained her in the

United States in violation of petitioner's custody rights under

Polish law.  (*See generally* ECF No. 6, Verified Amended Petition

for Return of Child ("Am. Pet.").)  Respondent counters, *inter*

*alia*, that, even if her removal and/or retention of the child in

---

[1] To protect the child's identity, her initials will be used instead of her
name pursuant to Fed. R. Civ. P. 5.2.  *See Radu v. Toader*, 805 F. Supp. 2d 1,
3 n.1 (E.D.N.Y. 2011), *aff'd*, 463 F. App'x 29 (2d Cir. 2012) (summary order).

the United States is deemed wrongful, this court should
nonetheless deny the petition because more than one year has
elapsed since the child's removal from Poland and she is now
settled in the United States.

The court conducted a three-day hearing on August 3,
4, and 5, 2015, and the parties and their witnesses testified
with the assistance of a Polish interpreter.  The parties made
post-hearing submissions, which were completed on August 28,
2015.  For the reasons set forth below, the court finds that the
Article 12 now-settled defense is available to respondent and
denies petitioner's application for relief under the Hague
Convention.

**BACKGROUND**

I.   **Findings of Fact[2]**

A.   **Petitioner and Respondent's Meeting, the Parties'
     Relocation to Poland, and the Birth of the Child**

In 2007, while in the United States, petitioner, a
citizen of Poland, began dating respondent, also a citizen of
Poland, after meeting in South Lake Tahoe, California.  (ECF No.
65, Joint Stipulation of Facts dated 8/2/15 ("Stip.") ¶ 8; Tr.
34-35, 358.)  Petitioner was participating in a program through

---

[2] Unless otherwise indicated, the following facts have been established by a
preponderance of the evidence and are based upon evidence admitted at trial,
the parties' credible testimony contained in the hearing transcript ("Tr."),
and the joint stipulation of facts submitted by the parties.

his university known as Work and Travel, whereby international students could travel to the United States to work for a season and improve their English-speaking capabilities. (Tr. 34.) Respondent had completed her studies in Poland and was visiting her grandparents in New York with a view towards relocating to the United States. (Tr. 359.) While in the United States, respondent planned to obtain a green card and met with an attorney to begin the process. (Tr. 359; *see* Tr. 35.) Respondent discussed her plans with petitioner as they began to discuss plans for a future together. (Tr. 35; *see* Tr. 361.)

After respondent's visit to South Lake Tahoe, she returned to New York, where her grandfather lived. (Tr. 359-60; *see* Tr. 35.) Petitioner traveled to New York to join respondent, and they stayed together in Stamford, Connecticut, with respondent's green card sponsor. (Tr. 359-60.) Petitioner and respondent stayed in the United States for about one month, during which time they stayed in Stamford during the week and visited New York on the weekends to sightsee. (Tr. 261, 360.) While sightseeing in New York City on weekends, they would stay at respondent's grandparents' house in Queens. (Tr. 360.)

At the end of 2007, petitioner asked respondent to return to Poland with him so that he could complete his law school requirements. (Tr. 32, 35; *see* Stip. ¶ 9.) At the time

of petitioner's return to Poland, he told respondent that he had
approximately half a year remaining in his studies and had to
defend his master's thesis and pass a pre-apprenticeship
examination. (Tr. 36; 361.) Respondent agreed, believing that
petitioner only had one exam remaining,[3] and returned to Poland
with petitioner in 2008. (Tr. 32, 35, 361; Stip. ¶ 10.)
According to respondent, she and petitioner discussed returning
to the United States after he completed his remaining
requirements. (Tr. 362.) Petitioner stated that, although he
and respondent discussed traveling to the United States, they
did not discuss or make plans to return to the United States
with green cards. (Tr. 35, 37.) Petitioner also testified
that, after M.K.'s birth, he and respondent never discussed
raising her anywhere other than Poland. (Tr. 41.)

    Upon his return to Poland, petitioner lived with his
parents in their home in Poznan. (Tr. 36.) Respondent rented a
room in an apartment belonging to one of petitioner's friends,
also in Poznan. (Stip. ¶ 10.) In February 2008, respondent
learned that she was pregnant and informed petitioner. (Tr. 37-
39, 363.) Respondent expected that they would get married as a
result of her pregnancy, but the parties never married. (Tr.

---

[3] Respondent testified that petitioner in fact had three exams remaining and
had not yet written his thesis at the time they returned to Poland, whereas
he had told her that he only had one exam left to complete. (Tr. 361-62.)

363; Stip. ¶ 4.) According to respondent, petitioner told her that a pregnancy was not a reason to get married, and that he could not afford to get married.[4] (Tr. 364.) Although petitioner testified that he felt "very good" about becoming a father (Tr. 38), respondent testified that her relationship with petitioner began to deteriorate from the time his family learned about her pregnancy. (Tr. 365.)

Petitioner and respondent found an apartment to rent in Poznan and moved in together in May 2008. (Tr. 38, 364; Stip. ¶ 11.) Respondent spent the summer of 2008 at her family's home but returned to Poznan to give birth. (Tr. 365-66.) M.K. was born in September 2008 in Poznan. (Tr. 40; Stip. ¶ 1.) Respondent and her mother testified that the child was born prematurely, and respondent underwent surgery to remove her placenta.[5] (Tr. 303, 366.) After the child's birth, petitioner returned to work while respondent recovered and cared for the child full time. (*See* Tr. 40, 366-67.)

Respondent's mother traveled to Poznan to help respondent care for the child during her recovery because respondent was in a "very weakened state." (Tr. 303, 366-67.)

---

[4] During his testimony, petitioner stated that he never refused to marry respondent but could not marry her because he could not afford a wedding reception for 100 people. (Tr. 96.)

[5] Petitioner testified that M.K. was not born prematurely and that there were no complications from her birth. (Tr. 97-98)

Days after respondent's mother's arrival, she left petitioner and respondent's home at the behest of petitioner.[6]  (Tr. 304, 367.)  Respondent testified that she had wanted to leave as well but could not make the journey to her parents' home due to her own physical health and M.K. being only weeks old.  (Tr. 367-68.)

### B.  Respondent's Relocation from Poznan

Petitioner, respondent, and the child lived together in Poznan until approximately January 2011.[7]  (Stip. ¶ 11.)  The parties have materially conflicting recollections of their interactions and petitioner's interactions with the child during that time.  Petitioner repeatedly characterized his relationship with respondent while in Poland as "good" or "very good."  (Tr. 37, 38.)  Although petitioner admitted to arguing with respondent, at times loudly, he characterized those arguments as "constructive discussion" and "differences of opinion."  (Tr. 140.)  Petitioner testified that he never hit M.K. or raised his voice in anger in her presence.  (Tr. 94-95.)  While respondent

---

[6] Petitioner testified that he told respondent's mother to go home and relax due to his concerns about "experimental medication" she was taking for multiple sclerosis at the time.  (Tr. 99-101.)  Respondent's mother, as well as respondent, testified that while respondent was recovering from complications of childbirth, petitioner ordered respondent's mother to leave the house and threatened to call the police after she challenged him for constantly arguing with respondent.  (Tr. 307-308, see Tr. 367.)  Respondent's mother's husband traveled from their home in Szczytno to Poznan to pick her up at midnight.  (*Id.*)

[7] Petitioner's parents purchased an apartment for petitioner, respondent, and the child to live in, where petitioner presently resides.  (Tr. 132, 199.)

was living in Poland, petitioner's family saw petitioner, respondent, and M.K. often. (Tr. 41, 111-12.)

Respondent and other witnesses, on the other hand, testified that petitioner was verbally and physically abusive with respondent, sometimes in the child's presence. Respondent testified that petitioner would throw objects, yell, and call respondent names, including "idiot," "stupid," "worthless," and "pathological," while the child was present. (Tr. 378-80.) Respondent witnessed petitioner yelling at the child when they lived together in Poznan. (Tr. 375.) Respondent also reported that petitioner would sometimes grab and shake respondent during arguments. (Tr. 374, 385.) Respondent further testified that petitioner threatened her that, if she were to move out, he would leverage his own knowledge of the law and the influence of his mother, a judge in Poland, to take custody of the child from respondent. (Tr. 383-84.)

Aleksandra Sloka, respondent's cousin who took care of M.K. full time during the summer of 2010, observed petitioner and respondent arguing frequently. She observed petitioner throwing objects near, toward, or in the presence of the child and insulting respondent and her family. (Tr. 276-84.) Ms. Sloka also testified that she witnessed petitioner spank the child's backside. (Tr. 287, 291.) Respondent's mother

testified that the child told her that petitioner struck her on numerous occasions. (Tr. 314, 320.) Both respondent and Ms. Sloka observed changes in the child's behavior over time -- including grinding her teeth, balling her hands into fists, nailbiting, and clinging to her mother – that they attributed to the discord in the home. (Tr. 275, 288.) At a later point, after respondent and the child had moved away from Poznan, the child told respondent that petitioner had spanked her during her visit with petitioner. (Tr. 375.)

In the fall of 2010, respondent grew tired of the discord and tension at home and decided to leave the Poznan apartment with the child. (Tr. 44, 378, 382.) Petitioner appeared not to believe respondent initially when she told him she would be moving out. (Tr. 44-45; 382.) Petitioner testified that, after respondent and the child moved out, he believed that they would eventually return to Poznan to live together with him as a family. (Tr. 46-47.) At no point did petitioner or respondent seek a formal agreement or court order regarding their shared custody of M.K. Petitioner testified that he did not take steps to obtain a court order regarding custody or child support because he always thought that he and respondent would reconcile. Respondent testified that petitioner told her that such an order would tarnish his

reputation as an attorney and hamper his ability to earn money and pay child support.  (Stip. ¶ 18; *see* Tr. 45, 48, 153, 386.)

Nevertheless, in January 2011, respondent left petitioner, first to her parents' home in Szczytno, and then to an apartment in Olsztyn.[8]  (Tr. 44; Stip. ¶ 13.)  Petitioner continued to reside in Poznan, where he presently lives.[9]  (Stip. ¶ 16.)  After respondent's departure from Poznan, she and the child would visit petitioner on some weekends.  (Tr. 45, 387-88; *see* Stip. ¶ 19.)  When respondent and the child would return to Poznan to visit petitioner, they would stay at petitioner's apartment.  (Tr. 46.)  On occasion, M.K. would spend weekends in Poznan with petitioner without respondent.  (*See* Tr. 388-89.)  Respondent testified that, during these stays, M.K. would call respondent and ask to leave the visit with her father.  (Tr. 389.)  Petitioner would also visit respondent and the child in Olsztyn on a monthly basis and stay in a guest room in respondent's apartment.  (Tr. 49-48; 387-88.)  Petitioner reported communicating with respondent and the child by phone or Skype almost every day while they lived in Olsztyn.  (Tr. 47-48.)  Petitioner continued to characterize his relationship with respondent as "good" during this time.  (Tr. 48.)

---

[8] Both Szczytno and Olstyn are at least a six hour drive away from Poznan. (Stip. ¶ 14-15.)

[9] Petitioner presently works in a law practice that he started with a close friend, Marek Bartkowiak, in September 2013.  (Tr. 202, 227.)

## C.   Respondent and the Child's Departure from Poland in August 2013

Respondent met Marek Michalowski in Olsztyn during a period of vacation in 2012, and they became romantically involved.  (*See* Tr. 390.)  Mr. Michalowski had applied to take part in the green card lottery in 2010 or 2011 (Tr. 335, 349), and in early 2013, he was notified by the United States consulate that he had been selected for an interview, the final stage of the lottery process.  (Tr. 325-36, 349; *see* Tr. 391.) In order for respondent and the child to also obtain green cards through the lottery process, respondent and Mr. Michalowski would have to marry, which they did on April 13, 2013.  (Tr. 336-37, 349; *see also* 391, 395.)

In order for respondent and Mr. Michalowski to travel to the United States with the child, the child would need to obtain a passport.  (Tr. 392.)  In March 2013, respondent sought petitioner's assistance in obtaining a passport for M.K, and petitioner agreed to accompany respondent to the passport office.[10]  (Stip. ¶ 25; Tr. 394; *see* Tr. 49, 51, 392-93; Stip. ¶ 26.)  The child received her passport in April 2013.  (Stip. ¶ 28.)  Petitioner maintains that respondent explained to him that M.K. needed the passport for an upcoming vacation with

---

[10] Under Polish law, both parents of a minor child must appear in person to obtain a passport for that child.  (*See* Stip. ¶ 24; Joint Ex. 1.)

respondent within Europe.[11]  (Tr. 49.)  Petitioner further

testified that, at the time he accompanied respondent and M.K.

to the passport office in March 2013, he was not aware that

respondent had plans to marry Mr. Michalowski,[12] obtain a green

card, or travel to the United States.  (Tr. 50-52.)  Petitioner

stated that he would not have consented to the child obtaining a

passport had he known of respondent's plans to move to the

United States with the child and seek permanent residence.  (Tr.

52.)  Respondent testified that she informed petitioner that the

purpose of the passport was for M.K. to travel with respondent

and Mr. Michalowski to the United States if they succeeded in

the green card lottery.  (Tr. 392-94, 482-83.)

       Several weeks after respondent and Mr. Michalowski's

interviews at the U.S. consulate in May 2013, they received

temporary visas in their passports permitting their and M.K.'s

travel to the United States to obtain their actual green cards.[13]

(Stip. ¶ 29; Tr. 337-38, 350, 395, *see also* Joint Exs. 7, 8.)

After receiving their visas, respondent and Mr. Michalowski made

plans to travel to the United States with M.K. in September

2013, after a vacation to Croatia.  (Tr. 338, 400-401.)

---

[11] Petitioner's mother also testified that both respondent and the child told her that they would be going on vacation to Croatia. (Tr. 113-14.)

[12] According to petitioner, respondent informed him by phone in April 2013 that she would be getting married to Mr. Michalowski.  (Tr. 51.)

[13] In order to complete the process and obtain green cards, they would need to travel to the United States within 6 months of the interview.  (Tr. 400.)

Respondent and Mr. Michalowska later decided to forego the vacation to Croatia and instead fly directly to the United States in August 2013.  (Tr. 339.)  They rescheduled their travel due to the early start of the school year in New York City, respondent's grandfather's request for help in selling his Queens, New York house, and their anticipated expenses in connection with their international move.  (Tr. 339, 400-401.)  They purchased one way tickets to the United States about one week prior to their travel.  (Tr. 344.)  Mr. Michalowski did not quit his job prior to their departure, and he and respondent only packed clothing because their room in respondent's grandfather's house was furnished.  (Tr. 480.)

In August 2013, prior to respondent, Mr. Michalowski, and M.K.'s departure for the United States, petitioner and his family took M.K. to the Polish seaside for vacation.  (Tr. 53; *see* Tr. 112-14, 340, 402-403.)[14]  Respondent and Mr. Michalowski came to pick up the child from petitioner at the seaside.  (Tr. 53.)

Respondent, Mr. Michalowski, and M.K. arrived in New York on August 16, 2013.  (Stip. ¶ 32; *see* Tr. 427.)  Upon their

---

[14] Respondent and Mr. Michalowski testified that they learned towards the end of petitioner's vacation that petitioner had taken M.K. somewhere different, and farther away, than he had initially told respondent.  (Tr. 340-43, 403.)  They further testified that petitioner refused to meet them halfway and demanded that they pick up the child from the seaside, approximately 400 kilometers away from where respondent and Mr. Michalowski were living.  (tr. 343, 403.)

arrival, they stayed with respondent's grandfather in Queens
while respondent and Mr. Michalowski looked for work. (Tr.
345.) Respondent did not have a cell phone or access to a
landline telephone, so petitioner was unable to contact her.
(Tr. 53, 427-28.) Petitioner testified that he assumed that
respondent had no cell phone reception because she was in
Croatia. (Tr. 54.) She was later able to send emails to
petitioner by using a friend's computer and internet access.
(Tr. 428.)

On August 28, 2013, respondent emailed petitioner to
inform him that she and M.K. had landed in New York. (Pet. Ex.
2; *see* Tr. 54.) The email stated, in pertinent part:

> I was only now able to connect to the internet and write to you.
> First of all, I would like to inform you of a change in plans,
> due to factors out of my control. This concerns my grandpa, but
> his issue is personal, so I do not feel authorized to disclose
> specifics. I want you to know that [M.] and I have landed in New
> York. [M.] is doing well, she handled the flight well and is
> enjoying everything so far.
>
> For now, she is healthy and handling the hot weather. I am
> trying to make sure she sees as much of NY as possible, even
> though these temperatures are exhausting.
>
> Right now I am unable to give you details of our return, because
> it depends on several factors out of my control, but I promise
> that [M.] will contact you as soon as I am able to access Skype.

(Pet. Ex. 2.) Petitioner testified that he was shocked when he
received this email, as he had never consented to the child
obtaining a visa for travel to the United States.[15] (Tr. 53-54.)

_____

[15] Petitioner's friend and law partner, Marek Bartkowiak, testified that he
was present at the time petitioner received and read respondent's August 28,

Petitioner testified that he did not know from the email how long respondent's trip would be, but understood from later conversations that it would last about one month. (Tr. 55.) At the time of the August 28, 2013 email, petitioner did not have a phone number for respondent in the United States, and there is no evidence that respondent had a telephone number in New York. (Tr. 55.)

Respondent called petitioner once she was able to access a phone. (*See* Tr. 56.) During the call, respondent informed petitioner that she was pregnant with a second child. (Tr. 57.) Petitioner testified that respondent told him over the phone that she and M.K. would stay in the United States for approximately one year in order to ensure that the second child received American citizenship.[16] (Tr. 57.) Both respondent and Mr. Michalowski testified that they never told petitioner that they would return to Poland after a year. Respondent testified that, at the time she left for the United States, she intended to become a permanent resident, if possible, but she did not know how M.K. would adjust to living in the United States and whether she and her husband would be able to find work and achieve financial security. (Tr. 404.) (Tr. 357, 404; *see* Tr.

---

2013 email, and observed that petitioner appeared shocked at learning of respondent's travel to the United States. (Tr. 230-31.)

[16] Petitioner also told his mother that respondent and the child would be staying in the United States for a year. (Tr. 114-15.)

487.)  On September 27, 2013, after speaking to respondent on

the phone, petitioner wrote the following email to respondent:

> I understand that as of today you are going to stay in the US for
> a year. You know very well that I will not see [M.] and she won't
> see me until the next year.  [M.] and I are very eager to talk on
> Skype.  She misses me too.  Calling a cell phone from Poland is
> very expensive - PLN 2.00/min.  You presented me with a fait
> accompli.  So be it.  I hope you will get what you want and wish
> you luck. I would like to get your address so that I can send
> [M.] a gift. I am not going to make your life difficult so you
> don't have to be afraid. I simply have my own opinion of the
> whole situation and we always differed in that respect.  If you
> can, send me an e-mail to tell me how she is doing, how her
> kindergarten is and what she thinks of the whole situation.  I
> love [M.] very much and I want all the best for her.  If you
> moved there permanently, please do not lie to me - just tell me
> the truth.  That's all.
>
> P.S. Maybe I will manage to come in the future and I would like
> very much to do so because [M.] will always be the most important
> person to me.

(Pet. Ex. 4.)  Petitioner testified that his September 27, 2013

email did not provide his consent for the child's stay in the

United States.  (Tr. 89).  He also testified that respondent

never contacted him to correct his understanding, as expressed

in the above email, that respondent would be staying in the

United States for one year.  (Tr. 58.)  Respondent confirmed

that she did not respond to this email to correct any

understanding that petitioner may have had regarding the length

of her stay in the United States.  (*See* Tr. 490-92.)  Petitioner

also testified that, although he understood that respondent

would be staying in the United States for only one year, he did

not believe that she would stay for only one year.  (Tr. 64.)

At the hearing, petitioner testified repeatedly and emphatically that he did not consent to M.K.'s removal from Poland and that her removal and relocation to the United States violated his rights under Polish and international law. (Tr. 85-88.) He further stated that he never expressed any consent to the child's continued residence in the United States, but instead that his September 27, 2013 email indicated his "reflection" on or "response" to the situation, which was that he was placed in a *fait accompli* by respondent's actions. (Tr. 86-88.)

Respondent and Mr. Michalowski eventually purchased cell phones and phone cards in order to call individuals in Poland, including petitioner, and provided petitioner with a telephone number at which he could call respondent and the child. (Tr. 428-29.) Respondent testified that she never took steps to prevent petitioner from talking to the child; rather, she encouraged the child to speak to petitioner. (Tr. 429, 431.) She testified that she gave M.K. the option to call petitioner whenever she wanted, but M.K. expressed that she did not want to speak to petitioner because he had told her not to associate with her stepfather, Mr. Michalowski, who petitioner called "a stranger." (Tr. 429.)

Petitioner reported difficulty maintaining contact with the child in the months after her removal. (Tr. 61; *see* Pet. Ex. 3.) Respondent did not have home internet access when she moved to the United States and only obtained the ability to connect to Skype in July 2015. (*See* Pet. Ex. 5; Tr. 430.) In October 2013, the parties exchanged emails concerning petitioner's telephone communications with the child. In an email dated October 24, 2013, respondent asked petitioner not "to question [M.K.] about [respondent and her husband's] private life, such as issues relating to [respondent's] pregnancy, etc.", questioned petitioner's failure to pay child support[17] since the move, and informed petitioner that she would "consider the merits" of petitioner's conversations with M.K., since they had "evoke[d] trembling, frustration, and negative emotions" in the child. (Pet. Ex. 5.)

Petitioner responded via email on October 26, 2013, expressing frustration regarding the lack of information from respondent about the child and informing respondent that he "decided to legally secure [child support payments] until [M.K.] returns from the United States to Poland." (Pet. Ex. 6.)

---

[17] While respondent and the child lived in Poland, petitioner deposited child support payments into an account operated by respondent on behalf of the child. (Tr. 160-161.) Petitioner stopped making those payments after the child's removal. (Tr. 165-66, 173; *see* Stip. ¶ 48.) On February 13, 2015, petitioner opened a bank account in the child's name and deposited 2500 zlotys, approximately six months of child support payments, into that account. (Resp. Ex. AA; Tr. 218-20.)

Petitioner also wrote, "Your unilateral decision regarding the departure of our child for a year to the U.S. deprived me of personal and continued contact with [M.K.] as previously agreed . . . Your illegal actions force me to take legal action."  *Id.*

### D.  **Legal Action by Petitioner**

Petitioner continued to believe that M.K.'s removal in August 2013 from Poland and retention in the United States was illegal and began to file documents reflecting his position. (Tr. 89-90.)  On December 30, 2013, petitioner filed a Notification of a Suspected Crime with the Polish authorities,[18] averring that respondent and Mr. Michalowski abducted the child on or about August 15, 2013, "by way of a trip to the United States" without petitioner's consent.  (Stip. ¶ 34; Joint Ex. 12.)  He further alleged that he learned a month after the abduction that the three would remain in New York until September 2014 and stated that the "decision of [respondent] regarding their stay in US territory" was unilateral and unlawful and the "abduction of and the detention of [his] child must be recognized as unlawful."  (*Id.*)  Petitioner testified that, at the time he filed the Notification of a Suspected Crime, he was very upset about having sporadic contact with M.K.

---

[18] On February 26, 2014, the Prosecutor's Office in Olsztyn, Poland acknowledged receipt of the report.  (Stip. ¶ 36.)

and felt badly about having to take legal action in order to have contact with his daughter.  (Tr. 73.)

On February 14, 2014, petitioner filed a "Petition for Return of the Child on the Basis of the Convention Concerning Civil Aspects of Kidnapping a Child Abroad" in Poznan, Poland stating that respondent kidnapped the Child on August 15, 2013 "under the excuse of leave for further vacation to Croatia" and that the "[p]robable goal is New York."  (Stip. ¶ 35; Joint Ex. 13.)  Petitioner testified that at the time he filed both documents with the Polish authorities, he was "hopeful" that M.K. would be returned to Poland after a year but had "no certainty" that she would be returned.  (Tr. 73-75.)

On March 12, 2014, petitioner filed a report with the police in Olsztyn, Poland, alleging that the child was kidnapped by respondent and that such kidnapping occurred on August 15, 2013.  (Joint Ex. 14.)  Over the course of one week, from March 19 to March 26, 2014, petitioner sent respondent four emails stating that he had not been able to reach respondent and demanding telephone contact with M.K.[19]  (Pet. Exs. 16-19; Tr. 76-80.)

---

[19] Earlier email communications from respondent to petitioner indicated that, at different points in time, petitioner would speak to the child approximately every two weeks.  (Pet. Ex. 14; Tr. 159-60, 437-38.)

On March 27, 2014, the Polish Central Authority sent petitioner's Hague Convention application to the U.S. Department of State. (Stip. ¶ 38.) On May 26 and June 26, 2014, petitioner sent letters to the U.S. Department of State in support of his application stating that respondent was lying when she stated that she and the child were "going to vacation to visit her grandfather to New York City in August 2013." (Stip. ¶¶ 39-40; Joint Exs. 16-17.) Meanwhile, petitioner continued to ask respondent about her plans for M.K.'s return to Poland, noting that almost one year had passed since their departure to the United States. (Pet. Ex. 21; Tr. 80-81.) Petitioner testified that he became certain at this time, approximately August 10, 2014, that respondent would not return to Poland with the child. (Tr. 81-82; *see also* Pet. Ex. 21.) On February 20, 2015, petitioner filed the instant action. (*See generally* ECF No. 1, Petition.)

### E.    The Child's Life in New York Since August 2013

Respondent, Mr. Michalowski, and the child received green cards several months after their arrival in the United States and now enjoy permanent resident status. (Stip. ¶ 33; Tr. 348, 397; *see also* Joint Ex. 9.) They continue to reside in Queens. (*See* Stip. ¶¶ 42-43.) Soon after arriving in the United States, Mr. Michalowski found a construction job and

later transitioned into a managerial job in manufacturing, where he currently works.  (Tr. 345-46.)  Respondent gave birth to her second daughter in the United States in the spring of 2014. (Stip. ¶ 7; Tr. 347.)  Respondent completed a training program and, at the time of the hearing, expected to begin work in September 2015.  (Stip. ¶ 46.)

Upon arriving in New York, the child began kindergarten in Greenpoint, Brooklyn, which she attended for approximately four months before transferring to a school in Maspeth, Queens.  (Stip. ¶¶ 44-45.)  She has attended the elementary school in Maspeth since January 2014 and recently began the second grade.  (*See* Stip. ¶ 45.)  M.K. has a close relationship with both her sister and her stepfather.  (Tr. 348, 441.)  She is doing well in school and has learned to speak fluent English in the two years she has been in New York.  (Tr. 418; 442-43; *see also* Resp. Exs. F, M, P.)  She will begin attending Polish school in the fall of 2015 to learn how to read and write Polish.  (Tr. 418.)

At the request of the respondent, the court interviewed the child informally with the parties' counsel present and without her parents present.  (*See* Tr. 413-425.) M.K. appeared to be intelligent, articulate, and understanding of the importance of answering questions truthfully.  She spoke

at length about her activities over the summer, her experience at school, and her younger sister and family. (Tr. 415-419.) She did not immediately recall anything about Poland, other than that her father would give her "slaps." (Tr. 419-20.) When questioned, M.K. remembered her grandparents in Poland and reported that both respondent and Mr. Michalowski's mothers had come to visit, as well as other relatives of respondent's. (Tr. 420-21.) M.K. stated that she did not want to return to Poland because she would miss her family, New York, "all that stuff I have" in New York, and that she wanted to stay with her mother. She stated she did not want to visit her father in Poland. (Tr. 422-23.)

Petitioner testified that, at the time of the hearing, he is able to speak to M.K. at most once a week due to restrictions by respondent. (Tr. 83-84.) Petitioner's mother testified that she has had limited contact with the child since the child moved to the United States and that she has not visited the child because she did not have her address. (Tr. 116.) Neither petitioner nor any member of his family has visited the child in the United States since her arrival, though respondent had informed petitioner that he was welcome to visit the child in New York. (*See* Tr. 116, 436; Stip. ¶ 49.)

Petitioner told respondent that he was financially unable to travel to New York. (Tr. 437.)

## II. __Procedural History__

On February 20, 2015, petitioner filed the instant action pursuant the Hague Convention, petitioning the court, *inter alia*, to (1) direct the prompt return of M.K. to Poland; (2) prohibit M.K.'s removal from this district; (3) require respondent to immediately surrender any travel documents to law enforcement; (4) command respondent to appear with M.K., giving petitioner immediate access to M.K., and show cause why M.K. has been kept from petitioner; and (5) direct respondent to pay petitioner's legal costs and fees. (*See* ECF No. 1, Petition.)

On February 26, 2015, the court issued an order to show cause, ordering (1) that respondent appear with M.K. before the court on March 5, 2015, to show cause why M.K. has been kept from petitioner and why the court should not issue an order pursuant to the Hague Convention directing the relief sought by petitioner (described above); (2) that during the pendency of this action, respondent is prohibited from removing M.K. from this court's jurisdiction; (3) that respondent serve and file a response no later than March 3, 2015; and (4) that petitioner serve the Order to Show Cause and underlying petition and motion

papers upon respondent by personal service by February 27, 2015.
(ECF No. 7, Order to Show Cause.)

On March 2, 2015, respondent wrote the court requesting an extension to file opposition papers and that the court appoint pro bono counsel and provide a Polish interpreter. In her letter, she stated that M.K. was not wrongfully removed from Poland because petitioner consented to her relocation. Respondent further stated that petitioner did not exercise his custodial rights while respondent and M.K. lived in Poland, and that he did not attempt to reunite with M.K. in the two years that she has resided in the United States. (*See* ECF No. 12, Motion for Extension of Time to File Opposition Papers; ECF No. 13, Letter from Respondent filed 3/2/15.) On March 3, 2015, the court granted respondent an adjournment and directed the court's pro se office to post plaintiff's request for pro bono counsel. (Electronic Order dated 3/3/15.)

On March 11, 2015, counsel for respondent appeared in this action and the parties filed a stipulation extending the time for respondent to respond to the Amended Petition and the court's order to show cause until March 24, 2015, and requesting a status conference before the court. (*See* ECF Nos. 19, 20, 21.) Respondent, with the child, and counsel for petitioner and respondent appeared for a status conference on April 2, 2015.

Petitioner did not attend.  At the conference, counsel for
petitioner advised the court that petitioner was unlikely to
appear in person for any of the proceedings, including any
evidentiary hearing or trial.  An evidentiary hearing was
scheduled for June 1, 2015.

Following the conference, the court referred the
parties to Judge Pohorelsky for expedited pre-hearing discovery
and a settlement conference.  The parties appeared for mediation
with Judge Pohorelsky on May 5, 2015, and participated in
telephone conferences with Judge Pohorelsky on May 11, 13, 18,
21, 29, and June 5, 2015.  Due to the parties' ongoing
settlement discussions, the hearing date was adjourned without a
new date.  On June 5, 2015, the parties filed a joint letter
advising the court that they were unable to agree to the terms
of a settlement and requested a hearing date.

After pre-trial briefing on evidentiary matters and
the court's attendant rulings on those matters (*see* ECF Nos. 50,
51, 53; Electronic Order dated 7/29/15), a hearing was held on
August 3, 4, and 5, 2015.  (*See* ECF Minute Entries dated 8/3/15,
8/4/15, and 8/5/15.)  The parties filed a joint stipulation of
certain facts in advance of the hearing.  (ECF No. 65, Joint
Stipulation of Facts dated 8/2/15.)  Petitioner appeared by
videoconference from Poland for most of the hearing and waived

his appearance for certain portions of the proceeding. Both parties testified and presented testimony from witnesses who appeared in person, via telephone, and via video conference. The court granted the parties' requests to submit post-hearing briefing and scheduled such briefing to conclude on August 26, 2015. (*See* Electronic Order dated 8/6/15.)

The parties filed their post-hearing briefs on August 19, 2015. (ECF No. 71, Petitioner's Post-Hearing Brief ("Pet'r Br."); ECF No. 72, Respondent's Post-Hearing Memorandum of Law ("Resp. Mem.")). On August 7, 2015, respondent requested a two-day extension to file replies to the parties' post-hearing submissions, which the court granted (*see* ECF No. 69; Electronic Order dated 8/11/15); the parties filed their replies on August 28, 2015 (ECF No. 74, Petitioner's Reply ("Pet'r Reply"); ECF No. 75, Respondent's Reply ("Resp. Reply")).

**APPLICABLE LAW**

The Hague Convention governs both the wrongful removal and wrongful retention of children from their habitual residence. *See* Hague Convention, art. 1(a); 42 U.S.C. § 11601(a)(4). Both the United States and Poland are signatories to the Hague Convention, and it was implemented in the United States when Congress adopted ICARA. *See Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010).

"The Hague Convention is designed to deter parents or other guardians from unilaterally taking children from the country of their habitual residence to another country that might provide a 'more sympathetic forum for a custody dispute.'" *Radu v. Toader*, 805 F. Supp. 2d 1, 6 (E.D.N.Y. 2011) (quoting *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 196 (E.D.N.Y. 2010)). Moreover, "[t]he goal of the [Hague] Convention . . . is to restore the status quo, *i.e.*, to return the child to the country of his or her habitual residence so that a custodial determination can be made there." *Id*. "This goal is based on the notion that the most suitable forum for a custody dispute is the country of the child's 'habitual residence.'" *Id*. (quoting *Poliero v. Centenaro*, No. 09-CV-2682, 2009 WL 2947193, at *8 (E.D.N.Y. Sept. 11, 2009)). Accordingly, this court is "strictly prohibited from adjudicating the merits of the custody dispute, and [is] limited solely to determining whether the child should be returned." *Id*. (quoting *Poliero*, 2009 WL 2947193, at *9).

## I.  Prima Facie Elements

Petitioner and respondent bear specific burdens of proof set forth by ICARA.  First, petitioner has the *prima facie* burden of proving, by a preponderance of the evidence, that M.K. has been "wrongfully removed or retained within the meaning of

the Convention." 42 U.S.C. § 11603(e)(1)(A). The removal and retention of a child abroad is considered wrongful when:

> (a) it is in breach of custody rights attributed to a person, an institution or another body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

Accordingly, to present a *prima facie* case, petitioner must prove by a preponderance of the evidence that: (1) M.K. was habitually resident in Poland, but was removed to or retained in the United States; (2) the removal or retention was in breach of petitioner's custody rights under Polish law; and (3) petitioner was exercising those rights at the time of M.K.'s removal to or retention in the United States. *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

## II. <u>Affirmative Defenses</u>

"[I]f a court deems that there has been a wrongful removal or retention of a child under the age of sixteen, and the petition was brought within a year of the wrongful removal or retention, the country in which the child is located must 'order the return of the child forthwith,' unless the respondent is able to raise an affirmative defense." *Radu*, 805 F. Supp. 2d at 7 (quoting Hague Convention art. 12); *see Adamah v. Tayson*,

No. 09-cv-5477, 2010 WL 2265308, at *4 (E.D.N.Y. May 28, 2010)
(same).

A respondent may assert four possible defenses under
the Convention.  "Whether the respondent is required to make out
an affirmative defense by a mere preponderance of the evidence
or by clear and convincing evidence depends on the affirmative
defense proffered."  *A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624,
630 (E.D.N.Y. 2012) (citing *Friedrich v. Friedrich*, 983 F.2d
1396, 1400 (6th Cir. 2012)).

"First, a respondent may show by clear and convincing
evidence that there is a 'grave risk that [the child's] return
would expose the child to physical or psychological harm or
otherwise place the child in an intolerable situation.'"
*A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague Convention, art.
13(b)); *see* 42 U.S.C. § 11603(e)(2)(A).

"Second, he may show by clear and convincing evidence
that the return of the child 'would not be permitted by the
fundamental principles of the requested State relating to the
protection of human rights and fundamental freedoms.'"  *A.A.M.*,
840 F. Supp. 2d at 632 (quoting Hague Convention, art. 20); *see*
42 U.S.C. § 11603(e)(2)(A).

"Third, he may show by a preponderance of the evidence
that the return proceeding was commenced more than one year

after the child's removal or retention and that the child has become settled in its new environment." *A.A.M.*, 840 F. Supp. 2d at 632 (citing Hague Convention, art. 12); *see* 42 U.S.C. § 11603(e)(2)(B).

"And, fourth, he may show by a preponderance of the evidence that 'the person, institution, or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention.'" *A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague Convention, art. 13(a)); *see* 42 U.S.C. § 11603(e)(2)(B).

Finally, even if a respondent can establish one or more of the above affirmative defenses, the district court retains the discretion to permit the child to remain with the respondent or order the child's return. *In re D.T.J.*, 956 F. Supp. 2d 523, 529 (S.D.N.Y. 2013) (internal citations omitted).

## CONCLUSIONS OF LAW

The court first evaluates petitioner's *prima facie* case and then turns to respondent's affirmative defenses under the Hague Convention, including the Article 12 "now settled" defense, which is the focus of the parties' post-hearing submissions. Based upon a review of the evidentiary record, the court finds that respondent has satisfied the requirements of

the Article 12 defense as a matter of law and, so finding, declines to grant the petition.

As an initial matter, the court addresses petitioner's objection to the court's consideration of the child's views. (*See* Pet'r Br. at 24-25.) The Hague Convention does not set a minimum age for taking into account a child's opinion. *See* Explanatory Report ¶ 30. Although the parties stipulated to the fact that the child is well settled in the United States and does not want to return to Poland (Stip. ¶¶ 50-51), the court may consider M.K.'s testimony when determining whether she is now settled in New York or whether a grave risk of harm exists upon her return to Poland, but it must take into account M.K.'s age and degree of maturity in determining how much weight to give her views. Although the court does not base its decision to deny the petition solely on M.K.'s objection, in light of the court's assessment that M.K. is very intelligent, articulate, and mature for her young age, the court will consider M.K.'s comments during her interview in the context of the record as a whole in determining whether she is well settled in the United States and, if so, whether to deny the petition on the basis of that defense. *See Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001) ("*Blondin IV*") (concluding that the district court did not err in finding that an eight-year-old was old enough and mature

enough for her views to be considered as one factor in its grave

risk analysis).

III. **Petitioner's Prima Facie Case**

    A. **Habitual Residence**

        "Neither the Hague Convention nor its implementing

legislation defines 'habitual residence,'" *Villegas Duron v.*

*Arribada Beaumont*, 534 F.3d 142, 147 (2d Cir. 2008), but the

Second Circuit has articulated the following standard:

> First, the court should inquire into the shared intent of those
> entitled to fix the child's residence (usually the parents) at
> the latest time that their intent was shared. In making this
> determination the court should look, as always in determining
> intent, at actions as well as declarations. Normally the shared
> intent of the parents should control the habitual residence of
> the child. Second, the court should inquire whether the evidence
> unequivocally points to the conclusion that the child has
> acclimatized to [a] new location and thus has acquired a new
> habitual residence, notwithstanding any conflict with the
> parents' latest shared intent.

*Gitter*, 396 F.3d at 134; *see also Villegas Duran*, 534 F.3d at

147 (adhering to *Gitter*'s articulation of the standard).  The

Second Circuit has confirmed that the "parties' shared intent is

a 'question of fact to which [it] defer[s] to the district

court.'" *Daunis v. Daunis*, 222 F. App'x 32, 34 (2d Cir. 2007)

(quoting *Gitter*, 396 F.3d at 132); *see Adamah*, 2010 WL 2265308,

at *5 (quoting *Gitter*, 396 F.3d at 133) ("The intent of the

parties is a 'question of fact' to be determined by the district

court.")  In this case, the parties do not dispute that, until

August 16, 2013, the date respondent removed the child from

Poland, the child's habitual residence was Poland.[20]  (*See* Stip.
¶ 30.)

## B.  Violation of Exercised Custody Rights

"Under the [Hague] Convention and ICARA, a federal
court looks to the law of the child's place of habitual
residence to determine whether a petitioner possessed lawful
rights of custody at the time of a child's removal." *Norden-*
*Powers v. Beveridge*, 125 F. Supp. 2d 634, 638 (E.D.N.Y. 2000)
(citing Hague Convention, art. 3).  "Under the Hague Convention,
custody rights are defined as "rights relating to the care of
the person of the child and, in particular, the right to
determine the child's place of residence." *Poliero*, 2009 WL
2947193, at *11 (citing Hague Convention, art. 5).  "[T]here are
three possible sources of 'rights of custody:' judicial or
administrative decisions, legally binding agreements between the
parties, and operation of the law of the State." *Norden-Powers*,
125 F. Supp. 2d at 638 (quoting Hague Convention, art. 3).

---

[20] In her pre-hearing memorandum, respondent argued that, to the extent
petitioner claims that the child's presence in the United States did not
become wrongful until August 16, 2014, one year after her arrival in the
United States, the child's habitual residence had shifted to New York by that
date.  (ECF No. 60, Respondent's Pre-Hearing Memorandum of Law dated 7/29/15,
at 12 n.4.)  Because the court finds that petitioner did not consent to the
child's removal, and has not proven by a preponderance of the evidence that
he later acquiesced to the child's stay in the United States for a period of
one year, as discussed further below, the court considers the child's
habitual residence only at the time of her removal from Poland.

There are no judicial or administrative decisions or legally binding agreements defining the parties' rights of custody. The parties have stipulated that both petitioner and respondent have parental authority, including custody, over the child under Polish law.[21] (Stip. ¶ 21; *see* Stip. ¶ 20.) Accordingly, respondent's removal of M.K. to the United States, absent petitioner's consent,[22] would constitute a breach of petitioner's custody rights. *See In re Skrodzki*, 642 F. Supp. 2d 108, 115 (E.D.N.Y. 2007).

Respondent argues, however, that petitioner has not proven that he was exercising his custodial rights at the time of the child's removal. (Resp. Br. at 15 n.9.) Petitioner cites his involvement in raising M.K. during her first few years, his efforts to maintain contact with her after his

_____

[21] Polish family law provides that (1) "[a] child remains under parental authority until the age of maturity"; (2) "[p]arental authority is exercised by both parents" unless the court determines that it is in the child's interest to "suspend, limit, or deprive one or both parents of parental authority"; (3) "[p]arental authority . . . involves the right and obligation of the parents to exercise custody over the person and property of a child and to raise the child with a due respect for his rights and dignity"; and (4) "[i]f both parents have parental authority, each of them is obliged and authorized to exercise that authority." (*See* Stip. ¶ 20 (citing Polish Family Law, Chapter 2, Articles 92, 95, 97).)

[22] Respondent has argued separately that "[p]etitioner consented to the [c]hild's removal to the United States for the purpose of obtaining and exercising permanent resident status." (Resp. Br. at 24.) Under that defense, discussed further below, a district court is not bound to return a wrongfully removed or retained child if the respondent demonstrates by a preponderance of the evidence that the petitioner "had consented to or subsequently acquiesced in the removal or retention." *Mota v. Castillo*, 692 F.3d 108, 117 (2d Cir. 2012) (citing Hague Convention, art. 13(a) and 42 U.S.C. § 11603(e)(2)(B)).

separation from respondent, and his participation in the passport acquisition process as evidence of his exercise of his custodial rights.  Courts in this Circuit have recognized that the standard for evaluating whether a petitioner is exercising custody at the time of removal is fairly lenient.  *See, e.g.*, *In re D.T.J.*, 956 F. Supp. 2d 523, 533 (S.D.N.Y. 2013); *Souratgar v. Fair*, No. 12 CIV. 7797, 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012) *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013); *Olguin v. Cruz Santana*, No. 03 CV 6299, 2004 WL 1752444, at *4 (E.D.N.Y. Aug. 5, 2004).

A petitioner can shift the burden of disproving his actual exercise of his custodial rights to the respondent by providing "some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate."  *Olguin*, 2004 WL 1752444, at *4 (citing Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law, in* 3 Acts & Documents of the Fourteenth Session 426, 449 (1980) ("Explanatory Report")).  It is not the role of the court to decide how well petitioner exercised his custody rights.  The Sixth Circuit has held that:

> if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the

> custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Id.* at *5 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)).[23]

Respondent cites no authority for her proposition that petitioner's involvement in raising the child while she lived in Poznan, visits with respondent and the child after they moved to Olsztyn, payment of child support, and efforts to communicate with the child are legally insufficient to establish that petitioner exercised his custodial rights. The fact that petitioner's visits with the child were irregular at times and that respondent was the child's primary caregiver since her birth do not mandate a finding that petitioner failed to exercise custodial rights under the Convention, as applied in the case law of this Circuit.

Accordingly, the court finds that petitioner has established a prima facie case of wrongful removal under the Hague Convention and turns to respondent's affirmative defenses.

## IV.  Respondent's Affirmative Defenses

### A.    Petitioner's Consent or Acquiescence

---

[23] In its legal analysis of the Convention, the Department of State noted that "[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494 at 10,507 (Mar. 26, 1986).

Respondent argues that petitioner consented to M.K.'s removal to the United States for the purpose of obtaining and exercising permanent resident status. (*See* Resp. Br. at 24.) Article 13 of the Convention provides that "the judicial or administrative authority of the requested State is not bound to order the return of the child if . . . the person . . . having care of the person of the child . . . consented to or subsequently acquiesced in the removal or retention." "Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible." *Hofmann v. Sender*, 716 F.3d 282, 294-95 (2d Cir. 2013) (quoting *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)) (internal quotation marks omitted).

The court next turns to the defense of acquiescence, notwithstanding that it is the petitioner's counsel who asserts that petitioner acquiesced to his child's retention in the United States for a limited period of one year, a position disputed by the respondent and petitioner himself. The defense of acquiescence is "analytically distinct" from the defense of consent. *In re Kim*, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005) (citing *Baxter*, 423 F.3d at 371). "The consent defense involves

the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* A showing of acquiescence requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time. *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *7 (E.D.N.Y. May 7, 2008) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)). Thus, although the "consent and acquiescence inquiries are similar," consent "need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a)." *Id.* The Ninth Circuit has held that once a district court finds *ex ante* consent, its inquiry is complete because a petitioner's *ex post* non-acquiescence would not revive his or her right of return under the Convention. *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).

The court finds that respondent's proof of petitioner's purported consent to the child's removal falls short. The record demonstrates that petitioner knew from an early point in his relationship with respondent that she wanted to become a permanent resident of the United States. The record also establishes that petitioner accompanied respondent to a

passport office in Poland after she requested that he consent to the child obtaining a passport.  The parties dispute, however, whether respondent told petitioner that she planned to move to the United States with M.K. prior to petitioner's agreement to help respondent obtain a passport for M.K.  Without circumstantial evidence crediting respondent's version of events over petitioner's, respondent is unable to prove by a preponderance of the evidence that petitioner consented to M.K.'s removal to the United States.

There is no indication of petitioner's subjective intent at the time prior to the child's removal other than his hearing testimony that he did not consent to her removal.  *See In re Kim,* 404 F.Supp.2d at 516 ("The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the intent.").  Respondent's assertion that she and Michalowski did not consider a trip to Croatia until June 2013, after petitioner had consented to a passport for M.K., does not necessitate a finding that petitioner knew of respondent's green card application, knew of her intention to move to the United States with M.K., or, most significantly, consented to such a

move.[24]  Accordingly, the Article 13(a) consent defense does not apply.

**B.  Grave Risk**

Article 13(b) of the Hague Convention provides that the signatory state "is not bound to order the return of the child" if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Although the respondent bears the burden of establishing by clear and convincing evidence that the exception applies, 42 U.S.C. § 11603(e)(2)(A), subsidiary facts may be proven by a preponderance of the evidence.  *Danaipour v. McLarey,* 286 F.3d 1, 13 (1st Cir. 2002); *see also In re Lozano,* 809 F. Supp. 2d 197, 224 (S.D.N.Y. 2011).

The Second Circuit considered the "grave risk" exception at length in *Blondin v. Dubois*, 189 F.3d 240 (2d Cir. 1999) ("*Blondin II*") and *Blondin IV*.  The court explained that mere showings of "inconvenience or hardship" do not amount to a "grave risk" of harm.  *Blondin IV,* 238 F.3d at 162.  Rather, a "grave risk" of harm exists where "the child faces a real risk

---

[24] In *In re D.A.*, which respondent cites in support of her consent argument, the court found that testimony from the respondent, D.A., and D.A.'s 22-year-old stepsister, as corroborated by a contemporaneous audio recording of the petitioner stating that he had given permission for them to move, was sufficient to establish the petitioner's consent to D.A.'s removal and retention thereafter.  *See In re D.A.*, No. 14-CV-5836, 2015 WL 2344079, at *6 (E.D.N.Y. May 14, 2015).

of being hurt, physically or psychologically, as a result of repatriation." *Id.* The court cited with approval the Sixth Circuit's observation that a "grave risk" to the child presents itself in two situations:

> (1) where returning the child means sending him to 'a zone of war, famine or disease'; or (2) 'in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'

*Id.* (quoting *Friedrich,* 78 F.3d at 1069 (emphasis added)). Even if a court finds there is a grave risk to the child, the court "must first determine whether there are any ameliorative measures that could be taken to mitigate this risk and enable a child to return safely to his home country" before refusing repatriation. *Reyes Olguin v. Cruz Santana (In re Reyes Olguin),* No. 03 CV 6299, 2005 WL 67094, at * 6 (E.D.N.Y. Jan.13, 2005) (citing *Blondin IV,* 238 F.3d at 157).

In this Circuit, undisputed evidence of a risk of harm will not satisfy the grave risk exception if the risk of harm proven lacks gravity. *See Blondin IV,* 238 F.3d at 162. District courts relying on the Article 13(b) defense to deny a petition for return have relied on "evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse." *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008) (citing *Elyashiv v. Elyashiv,* 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005)). "Evidence of sporadic or

isolated incidents of abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the 'grave risk' exception." *Id.* (internal citations omitted).

At the hearing, the credible testimony of Ms. Sloka established that she witnessed petitioner, on at least one occasion, spank the child and throw objects near the child or toward the baby seat where she was sitting. M.K. informed the court that she remembered petitioner giving her "slaps" in Poland. Ms. Sloka, respondent's mother, and respondent testified that the child told them that petitioner spanked her. Respondent also credibly testified that petitioner would argue with her loudly, call her demeaning names, and grab and shake her, at times in the presence of the child. Although respondent adduced evidence of discord in the home during the child's early years, no expert testimony or impartial assessment of the child's mental state were presented at the hearing. Absent more, the record before the court is insufficient to demonstrate by clear and convincing evidence a grave risk that the child's return to Poland would expose her to physical or psychological harm or otherwise place her in an intolerable situation.[25]

---

[25] In finding that respondent has not sustained her burden for the grave risk defense to apply, the court does not discredit the testimony of respondent, the child, and respondent's witnesses regarding the abuse she suffered from petitioner. Petitioner's argument that the abuse was not as severe as

Respondent also argues that the potential separation of the child from her sister and their happy, stable family would put the child at grave risk of psychological harm. (*See* Resp. Br. at 29.) Other district courts in this Circuit have declined to separate siblings where the grave risk defense was satisfied as to one child but not the other, acknowledging the grave psychological harm that could result from the separation of siblings. *See, e.g.*, *Ermini v. Vittori*, No. 12 CIV. 6100, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013) *aff'd as amended*, 758 F.3d 153 (2d Cir. 2014); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005). In this case, the court is concerned only with whether to return M.K. to Poland and finds that the proof offered by respondent is insufficient to entitle her to the grave risk defense, even though M.K. is likely to suffer emotional and psychological harm if she is separated from her sister and family.

Finally, even if the court were to find that M.K.'s return to petitioner's custody in Poland would place her in grave risk of harm, the court is unable to conclude on the existing record that "there is a lack of ameliorative measures which the Court could order to protect against the claimed grave

---

respondent alleged because she did not produce responsive documents to a request for documents relating to the alleged abuse (*see* ECF No. 61, Petitioner's Pre-Hearing Memorandum dated 7/27/15, at 10 n.11) is baseless.

risk." *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *9

(E.D.N.Y. May 7, 2008) (citing *Blondin II*, 189 F.3d at 249).

Accordingly, the court declines to deny the petition based on

respondent's grave risk defense.

### C.    **Fundamental Principles of Human Rights**

Respondent also argues that separating M.K. from her

sister would be a violation of M.K.'s human rights.  (*See* Resp.

Br. at 29.)  Article 20 permits the requested State to refuse

the return of the child when it "would not be permitted by the

fundamental principles of the requested State relating to the

protection of human rights and fundamental freedoms."  The

Article 20 defense must be "restrictively interpreted and

applied" "on the rare occasion that return of a child would

utterly shock the conscience of the court or offend all notions

of due process."  51 Fed. Reg. at 10,510.  Other courts have

noted the absence of any published federal case law in which the

Article 20 exception was found to have been established.  *See,

e.g., Souratgar v. Fair*, No. 12 CIV. 7797, 2012 WL 6700214, at

*15 (S.D.N.Y. Dec. 26, 2012) *aff'd sub nom. Souratgar v. Lee*,

720 F.3d 96 (2d Cir. 2013).  Thus, although the potential

separation of M.K. from her sister would be detrimental to

M.K.'s psychological state, such harm does not sustain a defense

under the stringent Article 20 standard.

**D. The "Now Settled" Exception**

Article 12 permits a judicial or administrative authority to refuse to order the repatriation of a child on the sole ground that the child is settled in his or her new environment, if more than one year has elapsed between the abduction and the petition for return. Article 12 first sets forth the general rule that:

> [w]here a child has been wrongfully removed or retained . . . and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Hague Convention, art. 12. It then provides an exception to that rule:

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

*Id.* (emphasis added). Thus, if more than one year has passed as of the date that a petitioner commences a judicial or administrative proceeding in the "Contracting State where the child is" (i.e., in the United States, not Poland), a "demonstra[tion] that the child is now settled in its new environment" may be a sufficient ground for refusing to order the child's return. *Blondin IV,* 238 F.3d at 164. This defense must be proven by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

The "now settled" defense grew out the Convention framers' view that "there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." *Blondin IV*, 238 F.3d at 164; *see also* Explanatory Report ¶ 107. Therefore, even though the exception "effectively allows [a court] to reach the underlying custody dispute, a matter which is generally outside the scope of the Convention," *Blondin IV,* 238 F.3d at 164, it permits courts to examine the child's present situation and circumstances if more than a year has passed since his or her removal. Article 12 does not define the term "settled." However, courts have interpreted it to ask whether "the child is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re D.T.J.*, 956 F. Supp. 2d 523, 533-34 (S.D.N.Y. 2013) (internal citations and quotation marks omitted).

As an initial matter, petitioner argues that this defense is not available to respondent because, at the time the instant petition was filed in this court, one year had not passed since August 2014, when M.K. was wrongfully retained in the United States. (*See* Pet'r Br. at 19-23.) In support of this theory, petitioner's counsel asserts that, in a September

2013 email (*see* Pet'r Ex. 4), petitioner acquiesced to M.K.'s stay in New York for a year from her August 15, 2013 departure from Poland, or until August 15, 2014.  (*See* Pet'r Br. at 19-23.)  Accordingly, the court first considers when the one-year period began to run.

In cases where a child was wrongfully removed from her country of habitual residence, the one-year period runs from the date of removal.  In cases of wrongful retention, the Explanatory Report states that "[t]he fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence."  Explanatory Report ¶ 108; *see also Taveras v. Morales*, 22 F. Supp. 3d 219, 232 (S.D.N.Y. 2014) *aff'd sub nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015); *Matovski v. Matovski*, No. 06 CIV. 4259, 2007 WL 2600862, at *11 (S.D.N.Y. Aug. 31, 2007).

Petitioner cites two factually distinguishable cases, *In re Cabrera*, 323 F. Supp. 2d 1303, 1313 (S.D. Fla. 2004) and *Panteleris v. Panteleris*, 30 F. Supp. 3d 674, 685 (N.D. Ohio 2014), in support of his position that the one-year period of wrongful retention should be computed from August 15, 2014, the

date on which his purported one-year period of acquiescence expired.[26]  In *Cabrera*, the respondent removed the child from Argentina to the United States pursuant to a signed agreement with the petitioner authorizing respondent to travel to the United States with the child.  *Cabrera*, 323 F. Supp. 2d at 1309. The petitioner subsequently agreed to the child staying in the United States for an additional 15 months, or until June 2003, but the respondent did not return the child to Argentina at the end of the agreed-upon period, as extended by the petitioner. *Id.*  The district court held that the wrongful retention began in, and the one-year period should run from, June 2003, when the respondent was supposed to return to Argentina with the child pursuant to the agreement with the petitioner.  *Id.* at 1312-13.

Likewise, in *Panteleris*, the petitioner consented to the children in question living in the United States with both the petitioner and the respondent for a defined period of approximately one year.  *Panteleris*, 30 F. Supp. 3d at 678-79. While living together in the United States, the petitioner and the respondent then agreed that the petitioner would return to Australia to seek work while the children remained in the United

---

[26] The *Cabrera* and *Panteleris* courts both considered the timeliness of the petitioners' petitions under Article 12.  Here, the court holds that the one-year period for the Article 12 "now settled" defense should be calculated from the date of the child's removal from Poland and, thus, the Article 12 defense is available to respondent, but the court does not find that the petition is untimely.

States with the respondent. *Id.* at 679. Several months after the petitioner returned to Australia in order to financially support the family while respondent and the children remained in the United States, the respondent informed the petitioner that she would not be returning the children to Australia. *Id.*

Unlike the petitioners in *Cabrera* and *Panteleris*, in this case, petitioner, by his own account, never consented to M.K.'s removal from Poland and retention in the United States. Thus, the date of the wrongful removal or retention was August 16, 2013, the date the child arrived in the United States. *See Matovski*, 2007 WL 2600862, at *11 ("[T]he children were abducted from their country of habitual residence without petitioner's knowledge or consent and brought to America. As soon as that occurred, all of the elements of wrongful removal or retention were established."). Petitioner cites no case in which a reviewing court found that the one-year period began on a date other than the date of removal in circumstances where a parent who did not initially consent to the child's removal from her habitual residence later purportedly acquiesced to the child's stay in the new country for a defined period of time.[27]

_____

[27] The line of cases on which petitioner relies for the proposition that the court should find that M.K. was wrongfully retained one year after her removal because of petitioner's purported acquiescence (*see* Pet'r Br. at 22-23) are inapposite. In each case, the children were removed from their country of habitual residence with the consent of the petitioner, and the court found that the "now settled" defense was unavailable to the respondent

Regardless, the evidence of record, including petitioner's own sworn testimony and contemporaneous actions, precludes a finding that he did in fact acquiesce to M.K.'s stay in the United States for a period of one year. As petitioner correctly points out, "acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." *In re Koc*, 181 F. Supp. 2d 136, 151 (E.D.N.Y. 2001) (internal citations omitted). At the hearing, petitioner was unequivocal in his position that he never consented to the child's removal to or retention in the United States. (*See* Tr. 85-88.) The September 27, 2013 email from petitioner to respondent, in which petitioner wrote, "You presented me with a fait accompli. So be it." falls short of a formal or even unambiguous statement that petitioner subsequently consented to M.K.'s retention in the United States. *See Laguna*, 2008 WL 1986253, at *7 ("A showing of acquiescence

_____

after holding that the wrongful retention began when the agreed-upon date for the child's return to the country of habitual residence passed without the child's return, rather than on the earlier date that the respondent informed the petitioner of the respondent's intention not to return the child. *See Chechel v. Brignol*, No. 510-CV-164-OC-10, 2010 WL 2510391, at *7 (M.D. Fla. June 21, 2010); *Falk v. Sinclair*, 692 F. Supp. 2d 147, 161-64 (D. Me. 2010); *Philippopoulos v. Philippopoulou*, 461 F. Supp. 2d 1321, 1323-25 (N.D. Ga. 2006). Here, the child was removed without petitioner's consent, as petitioner has argued emphatically, and there is no evidence in the record of any agreement between petitioner and respondent as to the date of the child's return. Accordingly, the wrongful removal or retention occurred when respondent brought M.K. to the United States in August 2013. Furthermore, as discussed further below, the evidence of record does not support a finding that petitioner acquiesced to the child's stay in the United States for a year.

requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time.") (internal citations omitted).

Petitioner argues that the fact that (1) he stated in an email in September 2013 that he understood that respondent and the child would stay in the United States for a year, (2) he told his mother that the child would stay in the United States for a year, and (3) he asked respondent by email when he should expect the child's return to Poland, noting that almost a year had passed since her departure, establish "a consistent attitude of acquiescence" over the one-year period.[28]  (*See* Pet'r Br. at 20-21 (quoting *Friedrich*, 78 F.3d at 1070).)

Petitioner's brief conflates any unilateral belief or understanding that petitioner may have had that respondent would return with the child after one year with his acquiescence to the child remaining in the United States for that year.  Any argument by petitioner's counsel that petitioner either consented to or acquiesced via email to a year-long stay is undermined by petitioner's conduct and testimony.  Whether or not petitioner thought that respondent and the child would

---

[28] Petitioner also argues that the fact that he filed his instant petition in federal court more than one year after M.K.'s departure is probative of his acquiescence to the child's stay in New York for one year.  (*See* Pet'r Br. at 21.)  The court finds this argument unpersuasive to bar application of the Article 12 defense, as the date of the filing of the federal court petition would entitle respondent to the defense's application.

return in August 2014, his actions indicate his lack of consent

to the child's presence in the United States.  *See* Taveras, 22

F. Supp. 3d at 236 n.18 ("Petitioner filed her initial request

for return with the Spanish authorities in February 2013,

however, suggesting that even she did not adopt [the position

that the retention did not become unlawful until June 2013].").

During the time in which petitioner purportedly

consented to M.K.'s retention in the United States, petitioner

repeatedly threatened respondent with legal action and reported

to various Polish authorities that M.K. had been unlawfully

abducted without his consent on August 15, 2013.[29]  Petitioner

filed a Notification of a Suspected Crime in Poznan, Poland on

December 30, 2013, several months after he purportedly

acquiesced to M.K.'s stay in the United States for a period of

one year, and alleged that respondent and Mr. Michalowski

abducted the child on August 15, 2013, on a trip to the United

States to which petitioner had not consented, that the "decision

of [respondent] regarding their stay in US territory" was

unilateral and unlawful, and that the "abduction of and the

detention of [his] child must be recognized as unlawful."  In

February and March 2013, petitioner filed additional documents

---

[29] Petitioner testified at the hearing that he prepared the December 2013
Notification of a Suspected Crime and February 2014 Petition for Return of
the Child without assistance from anyone else. (Tr. 73, 75.)

in both Poznan and Olsztyn alleging that M.K. was kidnapped on August 15, 2013.  (*See* Joint Exs. 13-14.)  In all of the foregoing documents that petitioner filed, he took the position that the removal and retention of the child was illegal.  (Tr. 89)

Moreover, as previously noted, petitioner unequivocally and repeatedly testified that M.K.'s removal and retention in the United States were without his consent and violated his rights.  (*See* Tr. 85-88)  Petitioner specifically refuted his counsel's argument that the September 27, 2013 email to respondent reflected petitioner's consent to M.K.'s continuing stay in the United States:

> Q:   Does [the September 2013] email of yours reflect your consent to M.'s continuing to stay in the United States?
> A:   No, it is not my consent for the stay of M. in the United States.

(Tr. 89.)

Accordingly, the court concludes, based on petitioner's unequivocal hearing testimony and the documents in the record, that the child's retention in the United States was wrongful as of the date of her removal on August 16, 2013.[30] Thus, because the petition was filed in February 2015, more than

---

[30] Although petitioner used August 15, 2013 as the date of the alleged kidnapping in his filings, the parties have stipulated that respondent and the child traveled to and entered the United States on August 16, 2013.  (*See* Stip ¶ 32.)

one year later, the "now settled" defense is available to respondent.

Having determined that the "now settled" defense is available to respondent, the court may consider factors including:

> 1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent

in determining whether the child is well settled in her new environment. *See Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014) (internal citations omitted). In an effort to avoid the child's testimony and streamline the presentation of evidence at the hearing, petitioner conceded that the facts in this case support a finding, by a preponderance of the evidence, that the child is well settled in her new environment for purposes of Article 12 of the Convention. (Stip. ¶ 50.)

The stipulation and respondent's exhibits in the record, the credible testimony from respondent and Mr. Michalowski, as well as comments from M.K. herself about her life in New York, indicate that M.K. is thriving in school, enjoys a vibrant social life and close relationships with her stepfather, mother, and sister, and is maintaining her ties to

her Polish family and heritage.  Although respondent only
recently found employment, Mr. Michalowski has been stably
employed since their arrival in the United States and has
provided financial support for respondent and M.K.  Finally,
although M.K. is only seven years old and such adaptation in a
two-year period is not unusual, the court finds that she is old
enough to have developed meaningful connections to the United
States such that she is "well settled" here.  *See Taveras*, 22 F.
Supp. at 237 (S.D.N.Y. 2014).  Accordingly, in light of the
parties' stipulation, as well as the evidence presented at
trial, the court finds that M.K. is well settled in New York for
purposes of Article 12 of the Convention.

The court notes that, having found that respondent has
proven the Article 12 defense by a preponderance of the
evidence, it may nonetheless order M.K.'s return to Poland.  *See*
*Blondin IV*, 238 F.3d at 164.  Although the court recognizes that
petitioner was vigilant in pursuing legal avenues for return of
the child in Poland, the court finds that this case is one in
which "the child's interest in settlement" overcomes
petitioner's right to adjudicate the custodial dispute in the
child's country of habitual residence.  *See Taveras*, 22 F. Supp.
at 240 (citing *Lozano*, 134 S.Ct. at 1235).  Accordingly, the
court denies the petition for the child's return to Poland.

## CONCLUSION

The court is hopeful that the parties' sincere love for the child guides them in any future legal proceedings and that the parties seriously consider resolving this matter amicably.  Without any resolution having been reached to date, the court finds, upon careful consideration of the record, that the child is now well settled in her new environment within the meaning of Article 12 of the Hague Convention.  Accordingly, petitioner's request for relief under the Convention is denied, the petition is dismissed, and each party shall bear its own costs.  The court's prohibition on respondent's removal of the child from this district during the pendency of this action is hereby lifted.  The Clerk of the Court is respectfully requested to return the child's passport to respondent, enter judgment in favor of respondent, and close this case.

**SO ORDERED.**

Dated:    October 14, 2015
          Brooklyn, New York

                              _____/s/_____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge